09-3773-cv
*Matson v. Board of Education of the School District of City of New York*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term 2010

Docket No. 09-3773-cv

Argued: August 25, 2010          Decided: January 11, 2011

_____

DORRIT MATSON,

*Plaintiff-Appellant*,

- v.-

BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF NEW YORK, THE CITY OF NEW YORK, RICHARD J. CONDON,

*Defendants-Appellees.*[*]

_____

Before:  MINER, CABRANES, and STRAUB, Circuit Judges.

Appeal from a judgment entered in the United States District Court for the Southern District of New York (Crotty, J.), dismissing, pursuant to Federal Rule of Civil Procedure 12(b)(6), plaintiff-appellant's civil rights action, brought under 42 U.S.C. § 1983, alleging that defendants-appellees violated her right to privacy by publicly disclosing that she suffers from fibromyalgia, the District Court having determined that the plaintiff does not enjoy a constitutionally-protected privacy right as to that medical condition.

Affirmed.

Straub, Circuit Judge, filed opinion concurring in part and dissenting in part.

_____

[*] The Clerk of the Court is directed to amend the official caption as set forth above.

BARRY D. HABERMAN, New City, New York, *for Plaintiff-Appellant*.

RONALD E. STERNBERG, (*on behalf of* Michael A. Cardozo, Corporation Counsel of the City of New York, Leonard Koerner, and Christopher A. Seacord, *of counsel*), New York, New York, *for Defendants-Appellees*.

MINER, Circuit Judge:

Plaintiff-appellant Dorrit Matson appeals from a judgment entered in the United States District Court for the Southern District of New York (Crotty, J.), dismissing, pursuant to Federal Rule of Civil Procedure 12(b)(6), her civil rights action, brought under 42 U.S.C. § 1983, against defendants-appellees, the Board of Education of the City School District of New York (the "BOE"), the City of New York (the "City"), and Richard J. Condon (collectively, the "defendants"). In the action, Matson alleged that the BOE had publicly disclosed that she suffers from fibromyalgia, in violation of her constitutional right to privacy. The disclosure occurred when, in connection with an investigation of her purported use of sick leave, the BOE made available to the public on the website of the Special Commissioner of Investigation for the New York City School District ("SCI") a report that included Matson's medical condition. On appeal, Matson claims: (1) the District Court erred in concluding that she failed to establish that the defendants' disclosure of her medical condition implicated a protected privacy interest; (2) the District Court incorrectly found the BOE to be an improper party; and (3) the District Judge should have recused himself, pursuant to 28 U.S.C. § 455.

For the reasons that follow, we affirm.

2

**BACKGROUND**

I.      Matson as Teacher and Conductor

Matson was employed as a music teacher at Bayard Rustin Educational Complex ("Bayard Rustin"), a Manhattan public school. She also founded and served as director and conductor of the New York Scandia Symphony (the "Scandia Symphony"), an orchestra based at Trinity Church in lower Manhattan. Beginning in at least 2003 and continuing through February 2005, Matson began taking sick leave from her duties as a music teacher. Her multiple requests for sick days did not go unnoticed by Bayard Rustin's administration.

In November 2004, after Matson had requested three days of sick leave, Bayard Rustin's principal, John Angelet, reminded Matson by telephone that she was scheduled to direct a school orchestra concert that week. Matson nonetheless insisted that she needed the sick leave and that she would have to miss the school orchestra concert because she was ill. She subsequently took the sick leave that she had requested. After Matson returned to school, Angelet confronted her. He stated that he knew Matson had conducted the Scandia Symphony's concert while on sick leave because he had heard the performance broadcast on public radio. Matson, in response, "after a period of silence . . . asked the principal to deduct the days from her pay and then inquired whether Angelet 'knew what it was like to conduct a concert ill.'"

In January 2005, Matson was away from school on authorized medical leave for "continued therapy for recurrent bacteria infection." During her absence, Angelet filed a complaint with the DOE's legal department, accusing her of "theft of services." An assistant principal at Bayard Rustin also took action, informing Condon, the SCI, that he suspected that Matson was improperly claiming sick leave in order to work as a conductor of a symphony orchestra at Trinity Church. Condon

3

subsequently began an investigation.

In February 2005, Matson submitted an Application for Leave Without Pay for Restoration of Health (the "Application"), which was marked as confidential. Her Application was granted for a period from February 5, 2005, through June 30, 2005, and "was approved by the principal based on the physician's certification section completed by an unnamed doctor with an illegible signature." According to the physician's certification, Matson suffered from fibromyalgia, which involves "neck, shoulders, and upper and lower back pain."[1]

After Matson submitted her Application, SCI investigators visited the office of the physician whose address was listed on the certification and spoke with the office manager for Dr. Tsai Chung Chao, who had completed the physician's certification for Matson's request for leave. Chao verified that the signature on the physician's certification was his. Chao later spoke to one of Condon's investigators by telephone and explained that Matson suffered from fibromyalgia, a condition brought on by physical or emotional stress. He added that Matson had complained that her professional relationship with school administrators was strained and caused her stress. Chao informed the investigator that Matson needed time off from her DOE position but explained that she could be able to conduct an orchestra — even though she was suffering from fibromyalgia — because she would be away from the environment which caused the stress that resulted in the onset

---

[1] The National Institute of Arthritis and Musculoskeletal and Skin Diseases of the National Institutes of Health, United States Department of Health and Human Services, defines fibromyalgia as "a disorder that causes muscle pain and fatigue . . . . People with fibromyalgia have 'tender points' on the body. Tender points are specific places on the neck, shoulders, back, hips, arms, and legs. These points hurt when pressure is put on them." NATIONAL INSTITUTE OF ARTHRITIS AND MUSCULOSKELETAL AND SKIN DISEASES, FAST FACTS ABOUT FIBROMYALGIA (last updated July 2009), available at http://www.niams.nih.gov/health_info/fibromyaliga_ff.asp. Chronic Fatigue Syndrome, or CFS, and fibromyalgia are often discussed interchangeably although they are distinct medical conditions.

4

of her condition.

Following his investigation, Condon issued a letter report on August 16, 2005, (the "Report") to then New York City School District Chancellor Joel I. Klein confirming that Matson had repeatedly taken paid sick leave on days when she conducted the New York Scandia Symphony at Trinity Church. The Report verified Angelet's claim that Matson conducted the Scandia Symphony on November 18, 2004, while away from school on sick leave and detailed a number of other occasions over a period of two years from 2003 to 2005 where Matson claimed paid sick leave on days when she either rehearsed or conducted the Scandia Symphony. It also noted that according to the Operations Manager for Trinity Concerts, Matson "never missed a rehearsal or a performance" of the Scandia Symphony.

The specific references in the Report to fibromyalgia included the following:

> Dr. Chao explained that Matson suffered from chronic fatigue syndrome, known as fibromyalsia [sic]. He added that the teacher's condition was brought on by physical or emotional stress and that Matson had complained that her professional relationship with school administrators was strained and caused her stress. The physician informed the investigator that Matson needed time off from her DOE position and that the pain caused by fibromyalsia [sic] could take months to subside. According to Dr. Chao, Matson could be able to conduct an orchestra with fibromyalsia [sic] because she would be away from the environment which caused her the stress that resulted in the onset of the condition.

Based on Condon's investigation, the Report concluded that Matson abused the DOE's sick leave policy. Accordingly, it recommended that Matson's employment be terminated and that she be directed to repay any salary to which she was not entitled. Disciplinary charges later were lodged against Matson.

The SCI publicly issued its report, in accordance with its specific authority to issue reports of investigations where it would be in the best interest of the school district. See THE SPECIAL

5

COMM'R OF INVESTIGATION FOR THE NEW YORK CITY SCH. DIST., EXEC. ORDER NO. 11 (June 28, 1990), available at http://www.nycsci.org/public/Executive%20Order.pdf (giving the Deputy Commissioner authority to "issue such reports regarding corruption or other criminal activity, unethical conduct, conflicts of interest, and misconduct, that he or she deems to be in the best interest of the school district"). The Report was made available to the public on the SCI's internet website in August 2005, and the investigation and the Report were covered by the local press.[2]

On August 22, 2005, while disciplinary charges were pending, Matson was involved in a car accident, suffering a cervical sprain and injuries to her back and shoulders. Apparently, she continued on unpaid medical leave after her accident, following a January 10, 2006 determination by the DOE that she was "not fit" to return to work. In March 2006, Matson applied for disability retirement. With her application, she submitted a medical report of Dr. Daniel J. Powsner, who concluded that

> Matson is suffering from psychiatric illness, post-traumatic stress disorder, which is likely to remain chronic. . . . Recovery from this illness is not to be expected in the foreseeable future. This illness has rendered her unable to pursue her occupation as a teacher. I do not believe that any type of accommodations that could be made at her place of employment would improve her ability to work. She is totally and permanently disabled from her occupation as a teacher.

Powsner's ultimate diagnosis was "Post-Traumatic Stress Disorder."

The record before us does not reveal how Matson's employment with the school district ultimately came to an end. Apparently a disciplinary hearing had been scheduled but was terminated as indicated by an October 18, 2006 intra-departmental memorandum, which stated: "Please be

---

[2] The Report remains on the SCI's website and is available at: http://www.nycsci.org/reports/ 08-05%20Matson%20Dorrit%20Ltr.pdf. References to fibromyalgia and to a recurrent bacterial infection, however, are now redacted from the Report.

6

advised that the Dorrit Matson disciplinary hearing has been resolved. As a result the DOE is withdrawing the charges previously preferred against Ms. Matson. Please adjust your records accordingly." There is no indication from the parties or the record as to the disposition of Matson's disability retirement application following Powsner's report or as to why, according to DOE attorney Susan Jalowski, Matson's "disciplinary hearing ha[d] been resolved."

II.    Proceedings in the District Court

On August 14, 2008, Matson commenced this action by filing a complaint against the defendants in the United States District Court for the Southern District of New York. In her complaint, she asserted a claim under 42 U.S.C. § 1983 and alleged that her constitutional privacy rights had been violated. Matson contended that her medical condition of fibromyalgia improperly was disclosed to the public through the Report, published on the SCI's website, and later reported in New York City area newspapers. However, she neither challenged the SCI's finding that she abused sick leave nor its recommendation that she be terminated. Nor did she suggest that her medical condition was a disability that would need to be accommodated. Matson sought $2 million for damages plus attorney's fees.

On January 16, 2008, the defendants filed a motion to dismiss Matson's complaint for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6). Matson submitted two affidavits in opposition to the defendants' motion to dismiss. In her affidavit, she alleged that the disclosure of her medical information

> has affected my ability to seek other employment, as potential employers, when "googling" my name learn that I suffer from various ailments. . . . It has led to a belief that I am "unreliable" or "undependable", that I would be absent, without adequate notice, thereby effecting [sic] the ability of an orchestra to perform up to expectations.

7

Matson v. Bd. of Educ. of the City School District of the City of N.Y., No. 08 Civ. 7232 (PAC), 2009 WL 2462513, at *2 n.4 (S.D.N.Y. Aug. 7, 2009) (internal quotation marks omitted). An additional affidavit submitted by Andrew Ackers, a colleague of Matson's in the music industry, claimed that "[t]he public dissemination of [Matson's] medical condition has a severe impact upon [Matson] and the perception of the music world regarding [Matson] and possible employment. . . . The perception is that [Matson], suffering from fibromyalgia and/or chronic fatigue syndrome would be unreliable and undependable . . . ." Id. (internal quotation marks omitted).

In a Memorandum Order dated August 7, 2009, the District Court granted the defendants' motion to dismiss the complaint. Id. at *4. The court also rejected the affidavits submitted by Matson and Ackers, finding that each contained new factual allegations that were not set forth in the complaint and, thus, were not properly before the court for its consideration. It stated that in any event the "factual allegations [were] wholly conclusory and speculative." Id. at *2 n.4. Moreover, the court found that

> to the extent the Report might lead potential future employers to view Matson as unreliable or undependable, this would not be due to Matson's fibromyalgia — instead, it would be because the Report concludes that Matson shirked her work responsibilities at her full-time job by claiming sick leave in order to do work she preferred.

Id.

The complaint's reference to the Condon Report enabled the court to consider the Report's contents. Id. at *1 n.2 ("The facts contained in this Memorandum Order are drawn not only from the Complaint but also from the Report, which is integral to the Complaint and upon which the Complaint relies." (citing Subaru Distribs. Corp. v. Subaru of Am., Inc., 425 F.3d 119, 122 (2d Cir. 2005) ("[On a motion to dismiss], the court may consider any written instrument attached to the

complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint."))).

The court ultimately concluded that neither fibromyalgia nor a bacterial infection is a condition that gives rise to a constitutionally-protected privacy right. Unlike the serious medical conditions that courts have recognized as giving rise to a privacy right, the District Court found that "[b]oth of Matson's disclosed conditions are a far cry from the level of seriousness associated with HIV/AIDS [and] transsexualism . . . ." Id. at *3. With regard to any purported exposure to discrimination resulting from the publication of Matson's medical condition, the District Court found that "Matson cannot point to any history of discrimination against individuals with fibromyalgia that would lead the [c]ourt to conclude that she is likely to face discrimination, hostility, or intolerance because of her condition." Id. In addition, the court found that Matson had not alleged that the public disclosure of her medical conditions exposed her to "discrimination, hostility, or intolerance."[3] Id. Judgment was entered on September 25, 2009, and this timely appeal followed.

On appeal, Matson argues that the District Court erred in dismissing her complaint for failing to establish that the defendants' disclosure of her medical condition implicated a constitutionally-protected privacy interest. Specifically, Matson claims that her situation is different from that of individuals who have diminished levels of privacy, such as prisoners and those whose medical information was necessarily disclosed during a judicial hearing or as part of a public record. Instead,

---

[3] The District Court noted that while Matson alleged that her private medical information was published in New York City area newspapers, her complaint did not attach the newspaper articles or contain quotations from them. However, the court discussed an article about the Report that was published in The New York Times and concluded that the article "focused on Matson's abuse of the sick leave policy, not on the nature of her medical condition." Matson, 2009 WL 2462513, at *2 n.3.

she argues that she has set forth a viable cause of action because private medical information was disseminated, without her permission, and that that information has exposed her to unfair discrimination.

Matson also argues that the District Court improperly dismissed the BOE as a defendant in this action when it concluded that the "BOE ceased to be the agency responsible for New York City's public schools before the incidents giving rise to the Complaint occurred." Matson, 2009 WL 2462513, at *1 n.1. She contends that recent state case law holds that the BOE remains a separate entity — though now renamed the Department of Education — that must be sued in its own name and apart from the City.[4] Matson also argues on appeal, for the first time, that the District Judge was required, sua sponte, to recuse himself from this case. Matson argues that recusal was appropriate because the Judge was previously associated with the defendants in his capacity as the Commissioner of several New York City agencies and as Corporation Counsel for the City of New York. Matson also claims that the employment of the District Judge's niece by the defendants requires the Judge's recusal pursuant to 28 U.S.C. § 455.[5]

---

[4] Matson notes that the New York State Appellate Division has held that "the City and the Board remain separate legal entities. . . . The legislative changes do not abrogate the statutory scheme for bringing lawsuits arising out of torts allegedly committed by the Board and its employees, and the City cannot be held liable for those alleged torts." Perez ex rel. Torres v. City of N.Y., 837 N.Y.S.2d 571, 572 (App. Div. 2007) (citation omitted).

[5] When a plaintiff does not specifically move for recusal, a judge is obliged to take such action only if circumstances indicate that his "impartiality might reasonably be questioned." 28 U.S.C. § 455; see United States v. Bayless, 201 F.3d 116, 126–30 (2d Cir. 2000) (considering whether a judge should have sua sponte recused himself). Our review in such cases is limited to plain error, see United States v. Carlton, 534 F.3d 97, 100 (2d Cir. 2008), which we do not identify here. "Disqualification is not required on the basis of remote, contingent, indirect or speculative interests." Diamondstone v. Macaluso, 148 F.3d 113, 121 (2d Cir. 1998) (internal quotation marks omitted). That the experienced District Judge previously served as Corporation Counsel of the City of New York, and that his niece is employed by the Department of

**ANALYSIS**

**I.  Standard of Review**

"We review de novo a district court's grant of a motion to dismiss pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint as true and drawing all inferences in the plaintiff's favor." Legnani v. Alitalia Linee Aeree Italiane, S.P.A., 274 F.3d 683, 685 (2d Cir. 2001). We will "affirm only if it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." Id. (internal citations omitted). "Where the complaint involves a civil rights violation, as it does here, the standard is to be applied with particular strictness." Doe v. City of New York, 15 F.3d 264, 266 (2d Cir. 1994) (internal quotation marks omitted).

"For the purpose of such review, this Court must accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party." Connecticut v. Am. Elec. Power Co., 582 F.3d 309, 320 (2d Cir. 2009) (internal quotation marks omitted). The plaintiff's complaint must, however, "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp.v. Twombly, 550 U.S. 544, 570 (2007)); accord Ruston v. Town Bd. for Town of Skaneateles, 610 F.3d 55, 59 (2d Cir. 2010). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949. While a complaint need not contain "detailed factual allegations," it requires "more than an unadorned, the defendant-unlawfully-harmed-me

---

Education, does not constitute a basis for questioning his impartiality.  Accordingly, we reject plaintiff's recusal claim.

accusation." Id. (internal quotation marks omitted); accord DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).

II.     The Constitutional Right to Privacy for Medical Conditions

Matson's privacy claim presents the question: does the Constitution protect Matson's right to maintain the confidentiality of her fibromyalgia? As a general matter, "there exists in the United States Constitution a right to privacy protecting 'the individual interest in avoiding disclosure of personal matters.'" Doe, 15 F.3d at 267 (quoting Whalen v. Roe, 429 U.S. 589, 599 (1977)). "More precisely, this right to privacy can be characterized as a right to 'confidentiality,'" which "includes the right to protection regarding information about the state of one's health." Doe, 15 F.3d at 267; accord United States v. Westinghouse Elec. Corp., 638 F.2d 570, 577 (3d Cir. 1980) (recognizing that "[i]nformation about one's body and state of health is matter which the individual is ordinarily entitled to retain within the private enclave where he may lead a private life." (internal quotation marks omitted)). This constitutional right to privacy extends in a limited way to prisoners as well. See Powell v. Schriver, 175 F.3d 107, 112 (2d Cir. 1999) ("[I]nmates retain those constitutional rights that are not inconsistent with their status as prisoners or with the legitimate penological objectives of the corrections system." (internal quotation marks and alterations omitted)).

Our case law makes clear, however, that "the interest in the privacy of medical information will vary with the condition." Powell, 175 F.3d at 111; accord Doe, 15 F.3d at 267 (noting that a constitutional right to privacy for some diseases is greater than for others because while "there are few matters that are quite so personal as the status of one's health, and few matters the dissemination of which one would prefer to maintain greater control over," this is "especially true with regard to those infected with HIV or living with AIDS" (emphasis added)). Confidential medical conditions

12

are those that are "excruciatingly private and intimate [in] nature" such as those "likely to provoke . . . an intense desire to preserve one's medical confidentiality." Powell, 175 F.3d at 111. We have concluded that such a privacy right exists with respect to a person's HIV status, Doe, 15 F.3d at 266–67, and transsexualism, Powell, 175 F.3d at 110–12.

In Doe, we explained that, as with any "serious medical condition," "an individual's choice to inform others that she has contracted what is at this point invariably and sadly a fatal, incurable disease [(HIV/AIDS)] is one that she should normally be allowed to make for herself." 15 F.3d at 267 (emphasis supplied).[6] We reasoned that this is "especially true with regard to those infected with HIV or living with AIDS, considering the unfortunately unfeeling attitude among many in this society toward those coping with the disease." Id. In particular, we considered that "[a]n individual revealing that she is HIV seropositive potentially exposes herself not to understanding or compassion but to discrimination and intolerance." Id.

In Powell, we applied our rationale in Doe and determined that "[l]ike HIV status as described in Doe, transsexualism is [an] unusual condition that is likely to provoke both an intense desire to preserve one's medical confidentiality, as well as hostility and intolerance from others." Powell, 175 F.3d at 111. We also found that "[t]he excruciatingly private and intimate nature of

---

[6] We understand that, since our decision in Doe, the prognosis for a person infected with HIV or living with AIDS has improved, given a range of new drug treatments. Nevertheless, that symptoms of HIV and AIDS may now be managed by a variety of treatments does not call into question the seriousness of these medical conditions. The U.S. National Library of Medicine has explained that "[a]lmost all people infected with HIV, if not treated, will develop AIDS," and that "there is no cure for AIDS. It is always fatal without treatment." U.S. Nat'l Library of Med., AIDS: MedlinePlus Medical Encyclopedia (last updated May 25, 2010), http://www.nlm.nih.gov/medlineplus/ency/ article/ 000594.htm (emphasis supplied). Moreover, we adhere to our observation in Doe that a person infected with HIV may face an "unfortunately unfeeling attitude among many in this society" and "expose[] herself not to understanding or compassion but to discrimination and intolerance." Doe, 15 F.3d at 267.

transsexualism, for persons who wish to preserve privacy in the matter, is really beyond debate." Id. In extending the constitutional right of privacy to cover transsexualism, we recognized the "narrow parameters" in which such a right exists. Id. at 112.

III.    Fibromyalgia and Privacy

Matson contends that fibromyalgia is a "serious medical condition" that falls within the ambit of constitutionally-protected privacy. We do not doubt the medical seriousness of the condition. Indeed, we have held within the context of reviewing the denial of a social security disability application that "a growing number of courts, including our own, have recognized that fibromyalgia is a disabling impairment," although "'there are no objective tests which can conclusively confirm the disease.'" Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2003) (quoting Preston v. Sec'y of Health and Human Servs., 854 F.2d 815, 818 (6th Cir. 1988)); see also Lisa v. Sec'y of Dep't of Health and Human Servs., 940 F.2d 40, 41 (2d Cir. 1991) (ordering the district court to remand the case to the Secretary for consideration of new medical evidence regarding fibromyalgia). We have also recognized that, properly alleged, "claims [of CFS/fibromyalgia] are unquestionably sufficient to plead a disability for purposes of Section 504/ADA." Weixel v. Bd. of Educ. of the City of N.Y., 287 F.3d 138, 147 (2d Cir. 2002).

A general medical determination or acknowledgment that a disease is serious does not give rise ipso facto to a constitutionally-protected privacy right. In Doe, we explained that HIV is "sadly a fatal, incurable disease." 15 F.3d at 267. Our reasoning in Powell with regard to transsexualism differed, as we approached the condition as a psychiatric disorder. There, we explained that transsexualism is a "gender identity disorder, the sufferers of which believe that they are 'cruelly imprisoned within a body incompatible with their real gender identity,'" and we further recognized

14

that transsexualism is a "profound psychiatric disorder." Powell, 175 F.3d 107, 111 (citing Farmer v. Moritsugu, 163 F.3d 610, 611 (D.C. Cir. 1998) (per curiam)) (quoting The Merck Manual of Med. Info. 418 (1997); Maggert v. Hanks, 131 F.3d 670, 671 (7th Cir. 1997)). Fibromyalgia, however serious, is neither alleged to be fatal, as we recognized the HIV condition to be in Doe, nor is it a "profound psychiatric disorder" as we noted in Powell. While fibromyalgia is characterized by fatigue and muscular soreness and tenderness, we have noted that it can be debilitating only in certain instances. Green-Younger, 335 F.3d at 104.

Other courts in our Circuit have declined to extend the right of privacy to medical conditions other than those discussed in the cases noted above. See, e.g., Watson v. Wright, 2010 WL 55932, at *1 (N.D.N.Y. Jan. 5, 2010) ("This [c]ourt finds no basis in Powell and its progeny for holding that, in a prison setting, plaintiff's Hepatitis C condition is the type of condition that gives rise to constitutional protection under Powell."); Rush v. Artuz, 2004 WL 1770064 (S.D.N.Y. Aug. 6, 2004) ("First, plaintiff's wrist injury and his stomach problems cannot be classified as 'personal matters of a sensitive nature' and second, due to his use of a splint, plaintiff's wrist injury was clearly visible to all those around him.").

Matson argues that our decision in O'Connor v. Pierson, 426 F.3d 187 (2d Cir. 2005), announced a rule that would protect all medical conditions from disclosure. We reject Matson's reading of O'Connor. In O'Connor, the plaintiff school teacher was first placed on administrative leave pending an investigation of complaints against him by students and other teachers. Then, the teacher was placed on involuntary sick leave when he refused to submit to an independent psychiatric examination and refused to release his past medical records. Id. at 191, 193. The teacher took issue with the conditions required for returning to work and commenced an action arguing that

15

the school board "violated his privacy rights by insisting that he sign a broad medical-records release form." Id. at 201.

Citing Doe and Powell, we held in O'Connor that the plaintiff "had a protected privacy right in the medical records sought by the Board." Id. We reasoned that "[m]edical information in general, and information about a person's psychiatric health and substance-abuse history in particular, is information of the most intimate kind." Id. Also, this combination of medical conditions is one that is likely to bring about public opprobrium. See, e.g., Wisconsin v. Constantineau, 400 U.S. 433, 437 (1971) (holding that a law permitting a list to be posted in retail liquor outlets of those individuals who become dangerous after drinking "may to some be merely the mark of illness, [but] to others it is a stigma, an official branding of a person"); Barbara A. Weiner, Confidentiality of Mental Health Records, 1 HEALTH L. PRAC. GUIDE §17:30 (2010) ("Although people are much more open about discussing their medical problems than in the past, there is still a stigma attached to having a mental illness."); cf. Rodriguez v. City of New York, 72 F.3d 1051, 1065 (2d Cir. 1995) (noting that "an erroneous commitment [in a psychiatric hospital] may result not only in an unwarranted deprivation of liberty but also in the unwarranted stigma of being labelled mentally ill by the state" (internal quotation marks omitted)).

In addition, our determination that an individual need not disclose all of his medical records under the circumstances described in O'Connor does not suggest that a third party's disclosure of one particular medical condition in every case violates the right of privacy. Indeed, the "privacy of certain medical conditions" has been "constitutionalized" only "[w]ithin narrow parameters." Powell, 426 F.3d at 112.

These narrow parameters have been defined, in large part, through the views of society.

Historically, courts have considered on a case-by-case basis whether a disease was "contagious . . . or attributed in any way to socially repugnant conduct" and whether it could be said that "society as a whole views [the disease] as directly associated with any disease which might conceivably be characterized as loathsome." See Golub v. Enquirer/Star Group, Inc., 89 N.Y.2d 1074, 1077 (1997) (holding that cancer did not fit into the category of a loathsome disease) (internal quotation marks omitted). Such inquiry typically helped determine whether a party could be charged with slander per se for falsely accusing someone of having the disease. See, e.g., Cruz v. Latin News Impacto Newspaper, 627 N.Y.S.2d 388, 389 (1995) (stating that there is no authority for classifying [tuberculosis] among the diseases among which false imputations are defamatory"); Simpson v. Press Pub. Co., 67 N.Y.S. 401, 402 (N.Y. Sup. Ct. 1990) (holding that "[t]o falsely say of one that he has leprosy is slander").

In considering claims that a constitutional right of privacy attaches to various serious medical conditions, we also proceed on a case-by-case basis. In doing so, we examine all the relevant factors that cut both in favor of and against extending privacy protection to such medical conditions. This type of analysis necessarily will include certain medical conditions but will exclude others. Here, although fibromyalgia is a serious medical condition, it does not carry with it the sort of opprobrium that confers upon those who suffer from it a constitutional right of privacy as to that medical condition. Cf. Makas v. Miraglia, Nos. 05 Civ. 7180 (DAB) (FM), 06 Civ. 14305 (DAB) (FM), 2007 WL 724603, at *17 (S.D.N.Y. Mar. 5, 2007), vacated in part on other grounds by Makas v. Miraglia, 300 F. App'x 9 (2d Cir. 2008) (summary order) ("[W]hile a patient's cholesterol or thyroid level also constitutes personal medical information, its disclosure obviously does not carry with it the same potential for adverse effects as the disclosure of information about a sexually-transmitted

17

disease or transsexualism.").

In addition to a determination that a medical condition is "serious," we have also focused our constitutional analysis on whether revealing one's condition would expose a person "not to understanding or compassion but to discrimination and intolerance." See Doe, 15 F.3d at 267 (emphasis supplied). Thus in Doe, we determined that society has an "unfortunately unfeeling attitude . . . toward those coping with [HIV or living with AIDS]." Id. Likewise in Powell, we explained that "[i]ndividuals who have chosen to abandon one gender in favor of another understandably might desire to conduct their affairs as if such a transition was never necessary. . . . [Transsexualism] is likely to provoke both an intense desire to preserve one's medical confidentiality, as well as hostility and intolerance from others." Powell, 175 F.3d at 111.

Here, we discern no evidence in the record revealing societal discrimination and intolerance against those suffering from fibromyalgia. Matson cites to one case from the District of Massachusetts, which found that "many people diagnosed with fibromyalgia are unable to maintain gainful employment." LaBrecque v. Sodexho USA, Inc., 287 F. Supp. 2d 100, 103 (D. Mass. 2003) (finding that the plaintiff's fibromyalgia rendered her physically impaired and holding that a reasonable jury could conclude that she properly made out a claim against her former employer for failing to accommodate her disability). But this case does not support the proposition, as contended by Matson, that one who is unable to maintain gainful employment because of fibromyalgia, is the subject of discrimination, hostility, or intolerance.[7] We agree with the district court that concluded

---

[7] The dissent proposes that the "relevant inquiry" in determining whether a constitutional right to privacy exists as to a certain medical condition is "simply whether the information concerns a serious medical condition that is highly personal." (Dissent at 4:9–11 (internal citations omitted)). We think that more germane to the inquiry is whether disclosure of one's medical condition would bring about public opprobrium and would expose a person to

18

(albeit in a different context) that "there is no evidence in the record that a social stigma is attached to Plaintiff's medical conditions [including fibromyalgia] in the same manner that one is attached to other medical conditions, such as AIDS." Rankin v. N.Y. Pub. Library, No. 98 Civ. 4821 (RPP), 1999 WL 1084224, at *1 (S.D.N.Y. Dec. 2, 1999). Moreover, we note, as the District Court did in dicta, that "[f]ibromyalgia has a drug therapy, Lyrica, which is regularly advertised on television alongside drug advertisements for everyday medical conditions such as high cholesterol, frequent urination, osteoporosis, acid reflux, and many other similar conditions." Matson, 2009 WL 2462513, at *3. We agree with the District Court that "[i]t is not possible to say that these commonly advertised conditions — publicly and regularly targeted by the drug companies — carry a social stigma equivalent to HIV/AIDS [or] transsexualism . . . ." Id.

Matson has also failed to allege with specificity facts upon which to base a conclusion that she personally suffered discrimination or intolerance. The allegations of her rejected affidavit that "potential employers, when 'googling' [her] name learn that [she] suffer[s] from various ailments," that she "has suffered a loss of income," and that the "acts of the Defendants have caused [her] to suffer monetary and psychological damages" are absent from the complaint.

Matson also claims that the defendants disclosed her private medical information for the purpose of "embarrassing" and "humiliat[ing]" her.[8] However, as noted above, the SCI has been

---

discrimination and intolerance, not simply whether the condition is "highly personal."

[8] The dissent highlights the "potentially embarrassing" nature of the "disclosed information" in concluding that fibromyalgia is the type of condition that gives rise to a constitutionally-protected privacy right. (Dissent at 12:12–15) We believe that the "potential" for embarrassment is too subjective a standard to support such a conclusion. Indeed, embarrassment is a decidedly personal emotion. While Matson may have found disclosure of her condition to be a source of embarrassment, others in the same position instead may find the Report's disclosure of an abuse of the DOE's sick leave policy to be the source of embarrassment.

19

given specific authority to issue reports of investigations where it would be in the best interest of the school district. Advising the public of the SCI's efforts to eradicate "fraud, misconduct, conflicts of interest, and other wrongdoing within the New York City school district" certainly is not outside of the Deputy Commissioner's authority. See THE SPECIAL COMM'R OF INVESTIGATION FOR THE NEW YORK CITY SCH. DIST., http://www.nycsci.org (last visited Nov. 19, 2010). Moreover, it is the practice of the SCI to issue public reports of its investigations. In 2005, the year in which Matson's Report was issued, the SCI publicly released ten other reports based on its investigations. See Reports, THE SPECIAL COMM'R OF INVESTIGATION FOR THE NEW YORK CITY SCH. DIST., http://www.nycsci.org (last visited Nov. 30, 2010). Among the reports also issued in 2005 was that of a teacher who was investigated for claiming sick time while, in fact, on a professional wrestling tour in Japan. The SCI separately published a report of a teacher who was investigated for claiming to be on military leave and deployed to New Orleans to provide Hurricane Katrina relief while, in fact, he had traveled to Brazil for personal reasons. Id. The SCI's frequent public release of its reports suggests that, rather than publishing Matson's report to embarrass or humiliate her, the SCI published the Report on its website as part of its policy to inform the public of its efforts to investigate instances of fraud within the New York City public school system. In any case, Matson has not alleged that she was, in fact, embarrassed or humiliated, nor has she challenged the SCI's findings and recommendations.

In an attempt to supplement the record, Matson submitted an affidavit (rejected by the District Court) of a music profession colleague stating that "public dissemination of the Plaintiff's medical condition has a severe impact upon the Plaintiff and the perception of the music world regarding the Plaintiff and possible employment," and "[a] performing orchestra would shy away

20

from hiring the Plaintiff because the performing orchestra fearing the perceived unreliability of the Plaintiff would loathe to put the Plaintiff in the position of the 'face' of said performing orchestra." However, Matson's complaint contained no specific allegations in this regard, and the District Court properly rejected consideration of the affidavit. See Kopec v. Coughlin, 922 F.2d 152, 154–55 (2d Cir. 1991) (explaining that "Rule 12(b) gives district courts two options when matters outside the pleadings are presented in response to a 12(b)(6) motion: the court may exclude the additional material and decide the motion on the complaint alone or it may convert the motion to one for summary judgment"). Moreover, there is not the slightest suggestion in the record that Matson's fibromyalgia has had any adverse impact on her employment as an orchestra conductor. In fact, the website for the Scandia Symphony boasts that "[i]n the highly competitive world of symphonic conducting, few can claim the success or unique accomplishments of Dorrit Matson, now in her seventeenth season as music director of the Scandia Symphony." NEW YORK SCANDIA SYMPHONY, http://www.nyscandia.org /about.html (last visited Nov. 19, 2010). The reviews posted on the website give rave reviews of Matson's work. Reviews, NEW YORK SCANDIA SYMPHONY, http://www.nyscandia.org/ page05.html (last visited Nov. 19, 2010). Matson is, indeed, the "face" of the Scandia Symphony. In sum, because Matson's complaint offered no allegations of societal or actual discrimination, hostility, or intolerance against her based upon her diagnosis, we affirm the judgment of the District Court.

**CONCLUSION**

Because we determine that Matson's medical condition does not enjoy a constitutionally-protected right to privacy, we need not reach her other claim, that the District Court erred in finding that the BOE was not a proper party. In accordance with the foregoing, the judgment is affirmed.

21

STRAUB, *Circuit Judge*, dissenting in part, concurring in part:

In finding that Matson has failed to state a viable claim of infringement of her privacy rights, the majority today gives the government substantial reign to publicly disseminate a person's intimate medical information without any justification. While it is of course not the case that every bit of medical information is encompassed within the right to privacy, in my view, the majority has forged an unduly narrow understanding of what is protected. Because I believe that Matson's allegations concerning defendants' publication of her diagnosis of chronic fatigue syndrome ("CFS") and/or fibromyalgia[1] suffice to state a privacy violation, I would reverse the decision of the District Court. Accordingly, I respectfully dissent. Given that I would reinstate Matson's claim, I also briefly address Matson's argument that defendant Board of Education of the City School District of New York ("BOE") is a proper party to this suit and find that it is. I concur only in the majority's conclusion that Matson has failed to identify any conflict disqualifying the District Judge.

---

[1] As an initial matter, contrary to the Report's disclosure that Matson suffers from "chronic fatigue syndrome, known as fibromyalsia [sic]," as the majority notes, *see ante* at **[4 n.1]**, the two conditions are in fact related but distinct. *See Chronic Fatigue Syndrome: Alternative Medicine*, MAYO CLINIC, http://www.mayoclinic.com/health/chronic-fatigue-syndrome/DS00395/DSECTION=alternative-medicine (last visited Dec.22, 2010) (describing fibromyalgia as "a disease that is considered similar to CFS"). Nevertheless, though the Report states that Matson has CFS, and though Matson complains about the public dissemination of her illnesses of "fibromyalgia and/or chronic fatigue syndrome" (e.g., Matson Br. 37, 38), the majority discusses only fibromyalgia, noting that the conditions are often discussed interchangeably. Because both the parties and the majority largely treat the two conditions as one, and because they are similar, I shall for the most part likewise not dwell on any differences between the conditions for purposes of this analysis.

1

## I.    Right to Privacy

Grounded in substantive due process, it is well established that the Constitution protects a person's privacy, including "the individual interest in avoiding disclosure of personal matters." *Whalen v. Roe*, 429 U.S. 589, 599 (1977).  In recognition of the fact that "[m]edical information in general . . . is information of the most intimate kind," *O'Connor v. Pierson*, 426 F.3d 187, 201 (2d Cir. 2005), as part of the right to privacy, we have already "accorded constitutional stature to the right to maintain the confidentiality of previously undisclosed medical information," *Powell ex rel. Devilla v. Schriver*, 175 F.3d 107, 112 (2d Cir. 1999).  *Doe v. City of New York* established that "the right to confidentiality includes the right to protection regarding information about the state of one's health."  15 F.3d 264, 267 (2d Cir. 1994).  "Extension of the right to confidentiality to personal medical information recognizes that there are few matters that are quite so personal as the status of one's health, and few matters the dissemination of which one would prefer to maintain greater control over."  *Id*.  *Doe* recognized that "[t]his would be true for any serious medical condition," and that it certainly was true in the case of a person's HIV status given that the disease is fatal and incurable and that those affected are often discriminated against.  *Id*.  *Doe* clearly did not set a baseline for the level of severity that a condition must reach for it to fall within the ambit of protected confidential information.  Rather, as we subsequently explained, *Doe* "held that 'individuals who are infected with the HIV virus clearly possess a constitutional right to privacy regarding their condition' because, as a more general matter, 'the right to confidentiality includes the right to protection regarding information about the state of one's health.'"  *O'Connor*, 426 F.3d at 201 (internal brackets omitted) (quoting *Doe*, 15 F.3d at 267).  "[T]hat the interest is at its zenith

2

in the context (presented in *Doe*) of a person's HIV status," *Powell*, 175 F.3d at 111, does not imply that information regarding less serious conditions is unprotected; indeed, such a result would be directly contrary to *Doe*'s indication that privacy protection should extend to information concerning "any serious medical condition" that one might ordinarily like to keep private, *Doe*, 15 F.3d at 267. As a district court in this circuit has recognized in finding that the right to privacy encompasses information that a person has sickle cell anemia,

> [w]ithout establishing a minimum standard that individuals must meet who seek to invoke the right to privacy in medical information, *Doe* indicates that the constitutional right to privacy in one's health protects information about "serious medical conditions," especially those that are likely to provoke "not . . . understanding or compassion but . . . discrimination and intolerance."

*Fleming v. State Univ. of New York*, 502 F. Supp. 2d 324, 342 (E.D.N.Y. 2007) (internal citation and brackets omitted).

Later decisions do not raise the bar. In *Powell* we recognized a right to confidentiality in transsexualism, a condition which we believed to be, akin to HIV, "the unusual condition that is likely to provoke both an intense desire to preserve one's medical confidentiality, as well as hostility and intolerance from others." 175 F.3d at 111. As such, we found that the "interest in privacy" concerning one's transsexualism, "like the privacy interest of persons who are HIV positive, is particularly compelling." *Id*. *Powell* thus suggests that one's transsexualism is a matter – like HIV infection – in which the privacy interest is at or near its "zenith." *Id*. Based on *Whalen*, *Doe*, and *Powell*, we "easily" found a protected privacy interest in medical records containing "information about a person's psychiatric health and substance-abuse history." *O'Connor*, 426 F.3d at 201.

These cases make clear that a medical condition need not be as serious as HIV or

3

transsexualism in order to be included in the scope of privacy protection.[2] That does not, of course, mean that the privacy right in the medical context is unbounded and I agree with the majority that a case-by-case analysis is necessary when determining whether a disease rises to the level where information concerning it is constitutionally protected; as we have previously stated, when dealing with dissemination of information concerning specific health issues, the "interest in the privacy of medical information will vary with the condition." *Powell*, 175 F.3d at 111. The relevant inquiry is simply whether the information concerns a serious medical condition that is highly personal. *See O'Connor*, 426 F.3d at 201; *Powell*, 175 F.3d at 111; *Doe*, 15 F.3d at 267. Where those criteria are met, a person "should normally be allowed" to decide "for herself" whether or not to inform others that she is so afflicted. *Doe*, 15 F.3d at 267.

In my view, Matson has adequately alleged the unwarranted disclosure of just such information. As the majority acknowledges, fibromyalgia is a serious medical condition, which "a growing number of courts, including our own, have recognized . . . [a]s a disabling impairment." *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003) (internal citation omitted). Similarly, the Centers for Disease Control ("CDC") explains that "CFS can be as disabling as multiple sclerosis, lupus, rheumatoid arthritis, heart disease, end-stage renal disease, chronic obstructive pulmonary disease (COPD) and similar chronic conditions." Chronic Fatigue Syndrome: Symptoms,

---

[2] In fact, though the majority emphasizes the narrow confines of the right to privacy, we do not appear to have ever rejected a privacy claim concerning medical information on the grounds that the information is not encompassed within the right to confidentiality. Indeed, even many of the lower court cases defendants cite in support of their argument that Matson's medical information is not entitled to protection find not that the information is not protected, but that disclosure of the information was justified. See *infra* at **[12-13]** for discussion of when protected information may be disclosed without infringing on the right to privacy.

4

CDC, http://www.cdc.gov/cfs/general/symptoms/ (last visited Dec. 22, 2010); *see also* David Tuller, *Chronic Fatigue No Longer Seen as 'Yuppie Flu,'* N.Y. TIMES, July 17, 2007, at F6 [hereinafter *Yuppie Flu*] (quoting an expert at the CDC describing people with CFS to be "as sick and as functionally impaired as [those] with AIDS, with breast cancer, [or] with chronic obstructive pulmonary disease"). Defendants in fact concede that the Report of the Special Commissioner of Investigation for the NYC School District ("SCI") disclosed a "serious medical condition" within the meaning of *Doe*, but focus on the fact that it did not disclose conditions that "have the potential to be fatal" (Defs.' Br. 9 (citing *Doe*, 15 F.3d at 217; *Fleming*, 502 F. Supp. 2d at 342)), and the majority similarly suggests that the non-terminal nature of the conditions significantly undermines the claim to privacy protection, *ante* at **[15]**. But a physical ailment is quite obviously in no way required to be lethal in order to be a matter "so personal" that "one would prefer to maintain greater control" over whether, when, and how to disclose that one is afflicted with that condition. *Doe*, 15 F.3d at 267.

More germane to the inquiry of what type of information is entitled to privacy protection is the consideration, highlighted by *Doe* and *Powell*, of whether a medical condition has the potential to provoke discrimination, hostility, or intolerance. We have never strictly required this factor in order to find a protected interest, but it is nevertheless a useful consideration in discerning whether the information in question is sufficiently personal. In this regard, the majority faults Matson for failing to provide "evidence in the record revealing societal discrimination and intolerance against those suffering from fibromyalgia" and/or CFS. *Ante* at **[18]**. That requires too much of a complaint. Indeed, neither the *Doe* nor *Powell* complaints alleged the widespread societal

5

discrimination and intolerance invoked in their respective opinions. (Am. Compl., *Devilla v. Schriver*, No. 92-cv-206 (W.D.N.Y. May 28, 1999); Compl., *Doe v. City of New York*, No. 92-cv-8044 (S.D.N.Y. Nov. 3, 1992).)[3] *O'Connor* is illustrative: Though in that case we found a protected interest in medical records without addressing the potential for discrimination, 426 F.3d at 201, the majority in this case now adds its own observation that the "combination of medical conditions" that the records in *Powell* reflected "is one that is likely to bring about public opprobrium," *ante* at **[16]**.

The notice pleading standard of the Federal Rules of Civil Procedure "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to give the defendant fair notice of what the . . . claim is and the ground upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)). The consequence of this standard is that once the complaint provides fair notice of the claim it "need not also allege specific facts establishing a prima facie case" or "include specific evidence," *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 119-20 (2d Cir. 2010) (internal quotation marks omitted); in fact, "[t]he pleading of additional evidence, beyond what is required to enable the defendant to respond, is not only unnecessary but in contravention of proper pleading procedure," *Roth v. Jennings*, 489 F.3d 499, 512 (2d Cir. 2007). The corollary to Rule 8(a) is that a complaint attacked on a motion to dismiss

---

[3] And though *Powell* arose following a jury trial, there is no indication that any evidence of societal discrimination was even offered at trial. That said, both the *Doe* and *Powell* plaintiffs did allege actual discrimination against themselves following disclosure. *Powell*, 175 F.3d at 109; *Doe*, 15 F.3d at 265. Similarly, the deep history of discrimination against those with sickle cell anemia recited by the District Court in *Fleming* is nowhere found in that complaint, though the plaintiff alleged adverse action against him personally. (*See* Am. Compl., *Fleming v. State Univ. of N.Y.*, No. 05-cv-5386 (E.D.N.Y. Jun. 23, 2006).)

6

pursuant to Rule 12(b)(6) will survive so long as the factual allegations – viewed in a light most favorable to the plaintiff and drawing all reasonable inferences in her favor – are sufficient to "raise a right to relief above the speculative level" and present a claim that is "plausible on its face." *Twombly*, 550 U.S. at 555, 570. At this stage, "the issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998).

Matson's complaint alleges that on or about August 17, 2005, defendants publicly disclosed her private medical information via the Report that they published on various websites. This is more than sufficient to provide defendants with the required notice of the claim and defendants in fact had no difficulty identifying the allegedly offending Report. That Report recited Matson's diagnoses of CFS and/or fibromyalgia and that recitation, as integral to the complaint, is treated as part and parcel of it. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006). Given the undisputedly serious nature of these conditions, and the slight inference required to appreciate that a person suffering from them may reasonably desire to keep that information private, I do not believe it can be said at this early stage that, as a matter of law, the conditions are insufficiently intimate to merit privacy protection. *Cf. Chance*, 143 F.3d at 702-03 (holding claim of Eighth Amendment violation in failure to provide adequate dental care to state sufficiently serious medical condition to survive motion to dismiss while recognizing that "not all claims regarding improper dental care will be constitutionally cognizable"). Moreover, Matson alleges that defendants disclosed her private medical information for the "purpose of embarrassing" and "humiliat[ing]" her. That is tantamount to alleging that the revelation that one is afflicted with CFS and/or fibromyalgia could be

7

stigmatizing and is entirely plausible.

CFS is properly viewed as plausibly stigmatizing in at least two respects. Although the etiology of CFS is not well understood, various studies have linked it to one or more infectious diseases.[4] *See Yuppie Flu*, *supra*. Given such reports, there is a distinct possibility that persons believed to have CFS may be stigmatized by others who would prefer not to expose themselves to this chronic, undesirable, and potentially contagious condition. At a minimum, this possibility would justify a CFS-sufferer's intense desire to keep his or her diagnosis private. On the flip side, for decades many have called the condition "yuppie flu" and "shirker syndrome," reflecting the apparent belief that those who claim to suffer from it are whining and not to be taken seriously. *See Yuppie Flu*, *supra*. These circumstances also indicate that one with such a condition might prefer to keep that knowledge private rather than be viewed in such a negative light.

The majority's purported reasons for the contrary conclusion do not withstand scrutiny. Rebuffing Matson's citation to *LaBrecque v. Sodexho USA, Inc.*, 287 F. Supp. 2d 100, 103 (D. Mass. 2003), as not supporting her contention that persons suffering from fibromyalgia may be targeted for discrimination, the majority focuses on a single statement in that opinion that fibromyalgia may impair a person's ability to work. *Ante* at **[18]**. While that fact alone may not indicate anything

---

[4] Some studies link CFS to a virus from the same family as HIV. Denise Grady, *Virus is Found in Many with Chronic Fatigue Syndrome*, N.Y. TIMES, Oct. 9, 2002, at A14. These viruses "insert themselves into their hosts' genetic material and stay for life." *Id*. While other studies challenge this correlation, at this point the American Red Cross will not accept blood donations from those with CFS, and the U.S. Food and Drug Administration is considering a similar ban. Simeon Bennett, *Mouse Virus Link to Chronic Fatigue Syndrome is Challenged in Four Studies*, BLOOMBERG, Dec. 21, 2010, http://www.bloomberg.com/news/print/2010-12-21/mouse-virus-link-to-chronic-fatigue-syndrome-is-challenged-in-four-studies.html (last visited Dec. 22, 2010).

about discrimination, in finding that the plaintiff's claim of discrimination under the Americans with Disabilities Act ("ADA") survived defendants' motion for summary judgment, *LaBrecque* more broadly confirms the plausibility of the notion that fibromyalgia may engender discrimination. Additional cases reaching similar results with respect to CFS and/or fibromyalgia, including our own, suggest that *LaBrecque* is not an aberration and further underscore the plausibility of a more widespread phenomenon of discrimination related to these medical conditions. *See, e.g.*, *E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606 (5th Cir. 2009) (finding genuine issues of material fact as to whether employer discriminated against CFS sufferer in violation of the ADA); *Weixel v. Bd. of Educ.*, 287 F.3d 138 (2d Cir. 2002) (finding allegations of discrimination against person with CFS and fibromyalgia sufficient to state an ADA claim); *Holt v. Olmstead Twp. Bd. of Trustees*, 43 F. Supp. 2d 812 (N. D. Ohio 1998) (denying motion for summary judgment to dismiss ADA claims of discrimination against CFS/fibromyalgia sufferer).

The statement in *Rankin v. N.Y. Pub. Library*, No. 98 Civ. 4821, 1999 WL 1084224 (S.D.N.Y. Dec. 2, 1999), finding no evidence in the record of that case of a social stigma attendant to fibromyalgia on par with that attendant to AIDS does not diminish this possibility. As the majority recognizes, that case arose in an entirely different context – that of a plaintiff seeking to proceed under a pseudonym. *Id*. at *1. The District Court denied the request, finding the plaintiff's privacy interest to be "outweigh[ed] [by] the long-standing policy of open judicial proceedings." *Id*. One affirmatively coming into court is apt to lose a measurable degree of privacy and the considerations presented in that situation are undeniably different. Indeed, while *Rankin* suggests that the stigma attached to alcoholism is insufficient to allow a plaintiff to proceed anonymously,

9

*id*. at \*1 (citing *Doe v. Frank*, 951 F.2d 320, 324 (11th Cir. 1992)), alcoholism appears to be precisely the type of condition which the majority finds to carry the requisite level of public opprobrium, *see ante* at **[16 ]** (noting that identification of individuals who become dangerous after drinking may constitute the "official branding of a person" (quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971)). Even if the comparison to a plaintiff seeking anonymity were appropriate, *Rankin*'s observation does not take us far. As already discussed, nothing in *Doe* or *Powell* set any minimum standards for the level of discrimination that a condition must provoke in order to be protected. Accordingly, it is of no moment that the discrimination faced by one with fibromyalgia and/or CFS may be less severe than that which a person with HIV and/or AIDS may face.

The majority's reference to the fibromyalgia drug Lyrica (noted first by the District Court) is also puzzling. Neither the majority nor the District Court explain how the fact of televised advertisements for a drug treatment bears on the issue of whether a condition is highly personal or carries social stigma.[5] Even if advertisement of drug therapy were somehow relevant, there is no

---

[5] Genital herpes – which would appear to meet the majority's definition of a condition entitled to privacy protection, *see ante* at **[18]** (suggesting that information about sexually transmitted diseases would carry sufficient opprobrium to be protected) – also has a drug therapy, Valtrex, commonly advertised on television. *See, e.g.*, CBS NEWS, *TV Drug Ads Too Emotional, Study Shows*, Jan. 29, 2007, http://www.cbsnews.com/stories/2007/01/29/health/webmd/main2411011.shtml (last visited Dec. 22, 2010) (describing television advertisement for Valtrex). Moreover, although the majority acknowledges the existence of a variety of drugs to manage HIV, it does not go on to consider that drug makers frequently advertise these drugs too. *See, e.g.*, Ron Leuty, *FDA: Gilead Ad For Truvada 'Misleading,'* S.F. BUS. TIMES, Apr. 9, 2010; Rebecca Ruiz, *Ten Misleading Drug Ads*, FORBES.COM, Feb. 2, 2010, http://www.forbes.com/2010/02/02/drug-advertising-lipitor-lifestyle-health-pharmaceuticals-safety.html (last visited Dec. 22, 2010) (mentioning Abbott Laboratories' advertisement for the HIV drug Kaletra); Jeanne Whalen, *Glaxo's HIV-Drug Ads Draw Critics*, WALL ST. J., Aug. 25, 2008.

similar treatment available (let alone advertised) for CFS. *See* Chronic Fatigue Syndrome: Treatment for CFS, CDC, http://www.cdc.gov/cfs/general/treatment/index.html (last visited Dec. 22, 2010) ("There is no cure, [and] no prescription drugs have been developed specifically for CFS.").

In short, the lack of any express allegation of past societal discrimination against those with CFS and/or fibromyalgia does not doom Matson's complaint.

The majority also treats as significant the lack of any proper allegation that Matson herself was discriminated against following disclosure. However, while whether the plaintiff actually suffered discrimination or was otherwise harmed by such disclosure is relevant to the issue of damages should liability be found, it is not the proper focus in determining the scope of the privacy right. Instead, in using discrimination as a proxy for ascertaining whether information is sufficiently personal to be protected, the proper consideration is the ex ante likelihood of stigmatization from the unwanted disclosure. *Cf. Powell*, 175 F.3d at 111 (finding privacy right where disclosure of a serious medical condition is "likely" to provoke "hostility and intolerance"); *Doe*, 15 F.3d at 267 (finding same where disclosure "potentially" results in "discrimination and intolerance"). In this regard, actual discrimination, hostility, or intolerance towards Matson is relevant only insofar as it may bolster the notion that this is the type of information that is likely to generate such a response. As already recounted, however, the complaint adequately indicates the plausibility of this notion and no more is needed at this stage.

In light of the above, I believe that information concerning a person's diagnosis of CFS and/or fibromyalgia falls comfortably within the ambit of plausible constitutional privacy protection

11

as established by *Whalen*, *Doe*, and their progeny. It is entirely plausible that the disclosed information is of the type that is highly personal and potentially embarrassing, such that one would and normally should be able to choose whether to inform others that she suffers from these serious conditions.

The existence of a privacy right is of course not alone sufficient to constitute a constitutional violation. Even where there is a protectable interest in the confidentiality of information, that right may be waived. *Powell*, 175 F.3d at 112 n.1. Additionally, the "confidentiality interest is not absolute . . . and can be overcome by a sufficiently weighty government purpose." *Statharos v. N.Y. City Taxi & Limo. Comm'n*, 198 F.3d 317, 323 (2d Cir. 1999). There is no dispute that Matson has adequately alleged that defendants disclosed matters without her permission. There is nothing in the fact of Matson's provision of her medical information to the BOE in support of her application for a leave of absence that could be considered to authorize the public dissemination of that information and Matson asserts that "[a]t no time" did she authorize such release.

Matson has also alleged unwarranted disclosure. Defendants have not argued that, if Matson's medical information were protected, they would have been justified in releasing it. That the SCI has the authority to – and apparently regularly does – publicly issue investigative reports does not in itself supply an adequate justification for publicly disseminating Matson's medical information. There is no indication why the public dissemination of the Report would have been any less effective in achieving any legitimate purpose without identifying Matson's specific diagnosis; indeed, that the Report remains on the SCI's website with Matson's private medical information redacted suggests just the opposite.

12

Where a plaintiff challenges executive action, however, only "conduct that 'shocks the conscience[]' will subject the government to liability for a substantive due process violation."[6] *O'Connor*, 426 F.3d at 203. While "necessarily imprecise," the shocks-the-conscience test "depends on the state of mind of the government actor and the context in which the action was taken." *Id*. (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833 (1998)). To the extent that Matson's allegation that defendants publicly broadcast her private information intending to embarrass and humiliate her is true, it would suffice. *See id*. ("[I]f the Board intended to injure or to spite O'Connor by insisting on a needlessly broad medical release as a condition of his reinstatement, that intent would plainly support liability in light of *County of Sacramento*.").

Both the majority and the District Court pay excessive attention to the suggestion that Matson abused her sick-leave time during her employment with the BOE. Such actions, even if true, are wholly irrelevant to whether Matson's medical diagnoses are the type of information entitled to privacy protection and serve only to unnecessarily paint an unflattering picture of Matson. This is especially so given that the disciplinary charges against Matson have been withdrawn. What was not – and cannot be – withdrawn, however, is the public dissemination of Matson's intimate medical information.

For the foregoing reasons, I believe the District Court's decision should be reversed. A *Whalen*/*Doe* privacy claim in the medical context, while not unbounded, is not so narrowly limited to the extreme privacy violations at issue in our previous cases and is broad enough to cover

---

[6] These rules are significantly loosened in the prison context. Prison officials impinge on an inmate's right to privacy "only to the extent that their actions are [not] reasonably related to legitimate penological interests." *Powell*, 175 F.3d at 112 (internal quotation marks omitted).

13

Matson's privacy claim. Matson has alleged an unauthorized and unwarranted disclosure of potentially protected information sufficient to withstand a motion to dismiss. Accordingly, I respectfully dissent.

**II.     BOE As Defendant**

In addition to dismissing Matson's complaint for failure to state a claim, the District Court concluded that even if the privacy claim were viable, the BOE would not be a proper defendant. The majority's disposition obviated its need to address Matson's argument that the dismissal of the BOE was erroneous; because I would reinstate Matson's privacy claim, I briefly address this issue.

In separately dismissing the BOE, the District Court first noted that in 2002 the BOE was stripped of its status as a semi-autonomous agency and renamed the New York City Department of Education ("DOE"). *Matson v. Bd. of Educ.*, No. 08 Civ 7232, 2009 WL 2462513, at *1 n.1 (S.D.N.Y. Aug. 7, 2009). The court then analyzed the DOE's amenability to suit and concluded that it was not amenable because, pursuant to the New York City Charter, as a city agency the DOE cannot be sued in its own name, and, in any event, because the SCI is independent of the DOE, Matson cannot allege any actions taken by the DOE that would subject it to liability. *Id*. There are several errors in this chain of logic.

First, while the District Court is largely correct that, following the 2002 amendments to the Education Law, the BOE is now frequently referred to as the DOE, *e.g., D.D. ex rel. V.D. v. New York City Bd. of Educ.*, 465 F.3d 503, 506 n.1 (2d Cir. 2006), the two are not entirely synonymous. The BOE "is created by the Legislature of the State of New York and derives its powers from State law." BYLAWS OF THE PANEL FOR EDUCATIONAL POLICY OF THE DEPARTMENT OF EDUCATION OF

14

THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK, Preamble, *available at* http://schools.nyc.gov/NR/rdonlyres/B432D059-6BFE-4198-8453-466FDE2B22D5/69835/PEPBylawsFinal91409.pdf [hereinafter BOE BYLAWS]. By statute, the BOE remains in existence. *See* N.Y. Educ. Law § 2590-b(1)(a) ("The board of education of the city school district of the city of New York is hereby continued."). The DOE, by contrast, is a creation of the BOE through the BOE's bylaws and is comprised of the thirteen BOE members along with "the Chancellor, superintendents, community and citywide councils, principals, and school leadership teams." BOE BYLAWS, Preamble.

Matson has sued the BOE (as one of three defendants along with the City and the SCI) and nothing about the BOE's creation of an additional broader entity would appear to require suits against the DOE instead of the BOE.[7] *Cf. Nacipucha v. City of New York*, 849 N.Y.S.2d 414, 419 (Sup. Ct. 2009) (quoting an official notice in the November 12, 2002 edition of the *New York Law Journal* explaining how to serve process on either "the New York City Department or Board of Education"). Moreover, the New York City Charter does not preclude suits directly against the BOE. Section 396 of the Charter provides that "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law." N.Y. City Charter § 396 (2009), *available at* http://www.nyc.gov/html/charter/downloads/pdf/citycharter2009.pdf. That provision "has been construed to mean that New York City departments, as distinct from the City itself, lack the capacity

---

[7] Indeed, the BOE has repeatedly been sued in its own name for alleged wrongs committed after 2002 without discussion. *E.g.*, *Weintraub v. Bd. of Educ.*, 593 F.3d 196 (2d Cir. 2010); *Mulgrew v. Bd. of Educ.*, 906 N.Y.S.2d 9 (1st Dep't 2010).

15

to be sued." *Ximines v. George Wingate High Sch.*, 516 F.3d 156, 160 (2d Cir. 2008). The BOE, however, is neither a department nor agency of the City. Historically, the BOE "was created as a public corporate entity which is . . . separate and distinct from the City of New York." *Nacipucha*, 849 N.Y.S.2d at 417. As such, the BOE could be – and indeed was required to be – separately sued for its alleged torts, as the City could not be held liable for the BOE's actions. *Id*. The Appellate Division of the New York Supreme Court has held that the 2002 restructuring of the BOE did not alter this system: "[T]he City and the Board remain separate legal entities[;]" "[t]he legislative changes do not abrogate the statutory scheme for bringing lawsuits arising out of torts allegedly committed by the Board and its employees, and the City cannot be held liable for those alleged torts." *Perez ex rel. Torres v. City of New York*, 837 N.Y.S.2d 571, 572 (1st Dep't 2007), *leave to appeal denied*, 837 N.Y.S.2d 393 (2008). Recourse for alleged wrongs committed by the BOE thus remain redressable through suits against the BOE. *See Nacipucha*, 849 N.Y.S.2d at 419 (explaining how to serve process on the BOE or DOE, as distinct from the City); Lee S. Kreindler et al., *New York Practice Series – New York Law of Torts* § 17:56 (2010).

Notably, defendants do not now and did not below suggest otherwise, as one would certainly expect the BOE or the City to have done if there were a wholesale prohibition on suits against the BOE.[8] In fact, seemingly to the contrary, defendants explained below that "it is well-

---

[8] Although in their brief below, defendants repeatedly referenced the "BOE," on appeal they state that, following the District Court's lead, they will refer to the BOE as the DOE. (Defs.' Br. 3 n.2.) Still, however, they do not argue that the DOE is not a proper party for the broad reason that the DOE cannot be sued in its own name. (In fact, on appeal, defendants do not in any way defend the District Court's separate dismissal of the BOE/DOE.)

In any event, its name as the New York City Department of Education notwithstanding, the DOE does not appear to be a city department within the contemplation of the City Charter.

settled that the Board of Education and the City of New York are separate and district entities." (Br. in Support of Defs.' Mot. to Dismiss, at 3, *Matson v. Bd. of Educ.*, No. 08-cv-7232 (S.D.N.Y. Jan. 16, 2009).) And for this reason defendants argued – and the District Court adopted this reasoning in the alternative – that the BOE should be dismissed since the SCI, which authored the offending Report, operates through the City and is thus a legal entity distinct from the BOE. However, even if the SCI's *investigation* cannot be attributed to the BOE, Matson alleges that the BOE participated in publicly releasing the SCI's Report, thus alleging wrongful actions directly by the BOE.

For these reasons, there is no additional barrier to Matson's suit against the BOE at this juncture and I would reverse the decision of the District Court in this regard as well.

## III.   *Sua Sponte* Recusal

Finally, though not raised below, Matson now claims that the District Judge erred in failing to *sua sponte* recuse himself from this matter. As there is no basis to find that the Judge's "impartiality might reasonably be questioned," 28 U.S.C. § 455(a), I concur in the majority's conclusion that recusal was not required. I offer but two additional observations in direct response to Matson's claims that the Judge's previous employment with the City of New York and his niece's

As we have previously observed, "departments of the City of New York typically, perhaps uniformly, have been created by the City Charter, which does not create a New York City Department of Education." *Ximines*, 516 F.3d at 159. In *Ximines*, after we remanded to the District Court to determine whether the DOE "is a subdivision of the Board as opposed to a department of the City" and whether it has "the capacity to be sued," *id*., the parties stipulated that "the Defendant in the above action will be 'The New York City Department of Education.'" (Stipulation, *Ximines v. New York City Dep't of Educ.*, No. 05-cv-1214 (E.D.N.Y. Mar. 21, 2008).) While this stipulation is of course not dispositive, it does suggest that the City Charter does not preclude suits against the DOE. As Matson has sued the BOE, and not the DOE, however, this is a matter I need not definitively resolve.

17

current employment with the DOE present disqualifying conflicts.

A judge's prior governmental service, even with the same entity appearing before the judge as a party, does not automatically require recusal. Rather, prior governmental service disqualifies a judge from presiding over a matter only if the judge directly participated in the matter in some capacity or expressed an opinion concerning the merits of the particular case. 28 U.S.C. § 455(b)(3); *accord* Code of Judicial Conduct for United States Judges Canon 3(C)(1)(e), *available at* http://www.uscourts.gov/rulesandpolicies/CodesofConduct.aspx [hereinafter CJC]. Matson does not contend – nor is there any indication – that the District Judge was in any way involved in this case prior to his assignment to the instant matter and, accordingly, his earlier service for the City does not require recusal.

Nor was the District Judge required to recuse himself on account of his niece's employment with the DOE. Matson contends that his niece is a "high level executive" of the BOE or the DOE. (Matson Br. 54.) Were that true, Matson's claim might have some bite. A judge shall disqualify himself if a "person within the third degree of relationship to" him – which includes one's niece – "[i]s a party to the proceeding, or an offer, director, or trustee of a party." 28 U.S.C. § 455(b)(5)(i); *accord* CJC Canon 3(C)(1)(d)(i). But the document Matson cites in support of her assertion suggests no more than that the District Judge's niece is the head of a single subsidiary office within the DOE – the Office of Multiple Pathways to Graduation – wholly unconnected to Matson, her employment, or the issues presented in this case. The niece's capacity as such does not present any problems.

18

**CONCLUSION**

In sum, I believe that Matson has adequately stated a claim of a privacy violation and, accordingly, would reverse the District Court's grant of defendants' motion to dismiss and reinstate the claim with respect to all three defendants. Because the majority concludes otherwise, I respectfully dissent. I concur only in the rejection of Matson's claim that the District Judge should have *sua sponte* recused himself.

19